**PLATZER, SWERGOLD, KARLIN,**
**LEVINE, GOLDBERG & JASLOW, LLP**
**Attorneys for H.P.G. Enterprises, Ltd.**
**1065 Avenue of the Americas, 18th Floor**
**New York, New York 10018**
**Telephone: (212) 593-3000\**
**Clifford A. Katz (CAK/4056)**
**Linda Mandel Gates (LMG/4953)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
MODE CONTEMPT, INC., MODA FURNITURE,
INC., MODA FAIRFIELD, INC., MODE PASSAIC,
INC. MODA MIDDLETOWN, INC.,

|  |  |
|---|---|
| Plaintiffs, | No. 08 civ 01867 |
| against | ANSWER, AFFIRMATIVE DEFENSES AND |
| H.P.G. ENTERPRISES, LTD., | COUNTERCLAIMS |
| Defendant. | |

-------------------------------------------------------------------x

Defendant, H.P.G. Enterprises, Ltd., by its attorneys, Platzer, Swergold, Karlin, Levine,

Goldberg & Jaslow, LLP, as and for its answer and affirmative defenses to the Complaint and for

its counterclaims, alleges as follows:

<u>Defendant's Response to Summary of Action</u>

Defendant, H.P.G. Enterprises, Ltd. ("HPG") denies, on its part, any breach of fiduciary

duty or contract.  On the contrary, HPG asserts that its good faith efforts were continually and

systematically thwarted by Plaintiffs purposeful and inappropriate conduct.  Said conduct causing

HPG damage damaged the ultimate sale of inventory.  HPG denies that Plaintiffs are entitled to

any recovery and asserts counterclaims against Plaintiffs herein.

<u>Jurisdiction and Venue</u>

1.      Admits that Defendant is a citizen of Delaware, and that the Agency Agreement is to be
        governed and construed according to the laws of the state of New York, but denies
        information and knowledge necessary to form belief as to the truth of the balance of the
        allegations set forth in paragraph "1" of the Complaint as to jurisdiction.

2.      Denies information and knowledge necessary to form belief as to the truth of the
        allegations set forth in paragraph "2" of the Complaint.

3.      Denies information and knowledge necessary to form belief as to the truth of the
        allegations set forth in paragraph "3" of the Complaint.

4.      Denies information and knowledge necessary to form belief as to the truth of the
        allegations set forth in paragraph "4" of the Complaint.

5.      Denies information and knowledge necessary to form belief as to the truth of the
        allegations set forth in paragraph "5" of the Complaint.

6.      Admits the allegations set forth in paragraph "6" of the Complaint.

7.      Denies information and knowledge necessary to form belief as to the truth of the
        allegations set forth in paragraph "7" of the Complaint, except admits that on or about
        January 8, 2007, the parties entered into a written agreement entitled "Agency
        Agreement" (the "Agreement") and refers the Court to the Agreement for its terms.

8.      Denies information and knowledge necessary to form belief as to the truth of the
        allegations set forth in paragraph "8" of the Complaint, except admits that on or about

January 8, 2007, each of the plaintiffs entered into a written agreement entitled "Security Agreement" (collectively, the "Security Agreements") with the Defendant and refers the Court to the Security Agreements for their terms.

9.    Denies information and knowledge necessary to form belief as to the truth of the allegations set forth in paragraph "9" of the Complaint, except admits that on or about January 18, 2007 and January 23, 2007, the Defendant and North Fork Bank entered into a subordination agreement and refers the Court to the Agreement for its terms.

10.    Denies information and knowledge necessary to form belief as to the truth of the allegations set forth in paragraph "10" of the Complaint, except admits that on or about January 18, 2007, the Plaintiffs and GE Commercial Distribution Finance entered into a letter agreement and refers the Court to the letter agreement for its terms.

<u>As and For Defendant's Response to the First Cause of Action</u>

11.    Defendant responds to paragraph "11" of the Complaint by repeating and re-alleging its responses to the allegations incorporated therein by reference.

12.    Denies the allegations set forth in paragraph "12" of the Complaint which calls for a legal conclusion.

13.    Denies the allegations set forth in paragraph "13" of the Complaint which calls for a legal conclusion.

14.    Denies the allegations set forth in paragraph "14" of the Complaint.

15.    Denies the allegations set forth in paragraph "15" of the Complaint.

<u>As and For Defendant's Response to the Second Cause of Action</u>

16.  Defendant responds to paragraph "16" of the Complaint by repeating and re-alleging its responses to the allegations incorporated therein by reference.

17.  Denies the allegations set forth in paragraph "17" of the Complaint.

18.  Denies the allegations set forth in paragraph "18" of the Complaint.

## AS AND FOR A FIRST AFFIRMATIVE DEFENSE

19.  The Complaint fails to state a claim upon which relief may be granted as against HPG.

## AS AND FOR A SECOND AFFIRMATIVE DEFENSE

20.  Plaintiffs' causes of action and claims are barred as a result of Plaintiffs' unclean hands and breach of its duty of good faith owed to the Defendant in connection with the negotiation and performance of the Agreement. Accordingly, Plaintiffs' claims must fail as a matter of law.

## AS AND FOR A THIRD AFFIRMATIVE DEFENSE

21.  Plaintiffs' causes of action and claims are barred as a result of bad faith perpetrated by Plaintiffs in the negotiation and performance of the Agreement.  Accordingly, Plaintiffs' claims must fail as a matter of law.

## AS AND FOR A FOURTH AFFIRMATIVE DEFENSE

22.  Plaintiffs' causes of action and claims are barred as a result of unconscionability, resulting from Plaintiffs' bad faith in the negotiation and performance of the Agreement. Accordingly, Plaintiffs' claims must fail as a matter of law.

## AS AND FOR A FIFTH AFFIRMATIVE DEFENSE

23.    Plaintiffs' causes of action and claims are barred as a result of the doctrine of Estoppel.

Accordingly, Plaintiffs' claims must fail as a matter of law.

## AS AND FOR A SIXTH AFFIRMATIVE DEFENSE

24.    Plaintiffs' causes of action and claims are barred as a result of the Plaintiffs' breach of the

Agreement.  Accordingly, Plaintiffs' claims must fail as a matter of law.

## AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE

25.    Plaintiffs' causes of action and claims are barred as a result of the failure of a condition

precedent.  Accordingly, Plaintiffs' claims must fail as a matter of law.

## AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE

26.    Plaintiffs' claims for attorneys' fees are not supported by the terms of the Agreement.

Accordingly, Plaintiffs' claims for attorneys' fees must fail as a matter of law.

## AS AND FOR A NINTH AFFIRMATIVE DEFENSE

27.    Defendant asserts a right to set off for any amounts alleged to be due to the Plaintiffs,

based upon among other things, inventory remaining at the Plaintiffs' premises, and

damages as a result of Plaintiffs' improper conduct.

## AS AND FOR A TENTH AFFIRMATIVE DEFENSE

28.    Defendant asserts that there has been an accord and satisfaction based upon the

acceptance of inventory.

## AS AND FOR DEFENDANT'S FIRST COUNTERCLAIM
(breach of contract)

29.     On or about January 8, 2007, Defendant and each of the Plaintiffs entered into the Agreement, a true copy of which is annexed hereto and made a part hereof as Exhibit "A".

30.     Pursuant to the express terms of the Agreement, on or about January 8, 2007, each of the Plaintiffs executed Security Agreements granting Defendant a security interest in all inventory of the Plaintiffs.

31.     On or about April 18, 2007, the Defendant and each of the Plaintiffs entered into a letter agreement supplementing the terms of the Agreement (the "Supplement")(the Supplement, together with the Agreement are referred to as the "Agreement"). A true copy of the Supplement is annexed hereto and made a part hereof as Exhibit "B".

32.     Pursuant to the express terms of the Agreement, on or about January 18, 2007, Defendant and North Fork Bank executed a subordination agreement (the "North Fork Agreement"), whereby North Fork Bank subordinated its interest in each of the Plaintiffs' inventory to the Agreement.   Accordingly, Defendant held a first priority security interest in all of Plaintiffs' inventory.

33.     Pursuant to the express terms of the Agreement, Defendant honored its obligations under the Agreement and conducted the sale of the merchandise, as defined in the Agreement.

34.     Defendant honored its obligations under the terms of the Agreement but was prohibited from exercising its rights under the Agreement as a result of the purposeful and direct acts of the Plaintiffs.

35.    Plaintiffs' purposeful and intentional acts violated the terms of the Agreement.

36.    Plaintiffs' purposeful and intentional acts prohibited Defendant from conducting the sale

as authorized pursuant to the Agreement.

37.    Plaintiffs' breached the Agreement with Defendant causing Defendant damage in an

amount to be calculated at trial, which may be set off from any amounts adjudicated to be

due Plaintiffs.

## AS AND FOR DEFENDANT'S SECOND COUNTERCLAIM
(breach of contract)

38.    Defendant repeats and re-alleges paragraphs 29 through 37 as if fully set forth herein at

length.

39.    Pursuant to the express terms of the Agreement, Defendant honored its obligations under

the Agreement and conducted the sale of the merchandise, as defined in the Agreement.

40.    Defendant honored its obligations under the terms of the Agreement but was prohibited

from exercising its rights under the Agreement as a result of the purposeful and direct acts

of the Plaintiffs.

41.    Plaintiffs' apparent non-payment of tax obligations caused representatives of the Internal

Revenue Service to shut down Plaintiffs' business operations, terminating the sale of

inventory authorized pursuant to the Agreement.

42.    The cessation of business and stoppage of the sale caused damage to the Defendant in an

amount to be calculated at trial.

## AS AND FOR DEFENDANT'S THIRD COUNTERCLAIM
### (breach of good faith and fair dealing)

43.     Defendant repeats and re-alleges paragraphs 29 through 42 as if fully set forth herein at

  length.

44.     Pursuant to the express terms of the Agreement, Defendant was authorized to conduct a

  sale of the merchandise, as defined in the Agreement.

45.     At the time of entry into the Agreement Plaintiffs knew or should have know about the

  existence of federal tax claims which would have impaired Defendant's ability to conduct

  the sale of inventory.  Plaintiffs knowingly and intentionally concealed the existence of

  these tax claims to the detriment of the Defendant.

46.     The cessation of business and stoppage of the sale caused by the federal tax claims caused

  damage to the Defendant in an amount to be calculated at trial

## AS AND FOR DEFENDANT'S FOURTH COUNTERCLAIM
### (Unjust Enrichment)

47.     Defendant repeats and re-alleges paragraphs 27 through 46 as if fully set forth herein at

  length.

48.     Pursuant to the express terms of the Agreement, Defendant honored its obligations under

  the Agreement and conducted the sale of the merchandise, as defined in the Agreement.

49.     Defendant honored its obligations under the terms of the Agreement but was prohibited

  from exercising its rights under the Agreement as a result of the purposeful and direct acts

  of the Plaintiffs.

50.     Pursuant to the terms of the Agreement, Defendant was authorized to sell certain

Merchandise as same was defined in the Agreement (the "Merchandise").

51.     As a result of Plaintiffs' wrongful conduct, Defendant was prohibited from selling the

Merchandise.   The Merchandise remained in the possession of Plaintiffs to the detriment

of the Defendant and unjustly enriching Plaintiffs through its possession, dominion and

control and sale.

52.     Plaintiffs have been unjustly enriched by its possession, control and sale of the

Merchandise in the amount of the value of said Merchandise to be proven at trial.

**WHEREFORE**, Defendant demands judgment against the Plaintiffs, jointly and

severally, on its First, Second, Third, and Fourth Counterclaim in amounts as may be determined

at trial, together with its costs and attorneys' fees.

Dated: June 12, 2008
        New York, New York

> Platzer, Swergold, Karlin, Levine,
> Goldberg & Jaslow, LLP
> Attorneys for H.P.G. Enterprises, Ltd.
> 1065 Avenue of the Americas, 18th Floor
> New York, New York 10018
> Telephone: (212) 593-3000
>
>
> By:   *Linda Mandel Gates*
> Linda Mandel Gates (lmg4953)

EXHIBIT A

## AGENCY AGREEMENT

This Agency Agreement (the "Agreement") is made as of this 5̲ day of January, 2007, by and among H.P.G. ENTERPRISES, LTD., a Delaware Corporation, with a principal place of business at One Monarch Place, Springfield, MA 01144 (the "Agent") and Moda Furniture, Inc., a New Jersey corporation with its principal place of business 125 South Street, Passaic, New Jersey, 07055; Moda Fairfield, Inc., a New Jersey corporation with its principal place of business at 425 Route 46 West, Fairfield, New Jersey, 07004; Moda Passaic, Inc., a New Jersey corporation with its principal place of business at 125 South Street, Passaic, New Jersey, 07055, Moda Middletown, Inc., a New York corporation with its principal place of business at 303 Route 211 East, Middletown, New York 10940; and Mode Contempo, Inc., a New York corporation with its principal places of business at 43 West 23rd Street, New York, NY 10010 and 86-46 Queens Boulevard, Elmhurst, NY 11373 (individually, and collectively: the "Merchant").

## RECITALS

WHEREAS, Merchant desires that Agent act as Merchant's exclusive agent for the purpose of (a) selling all of the Merchandise (as hereinafter defined) located in the seven (7) retail store locations set forth on Exhibit "A" attached hereto (each a "Store", and collectively, the "Stores"), and (b) the warehouse/distribution center identified on Exhibit "A" attached hereto (the "Warehouse") (such Sale being referred to herein as the "Sale" and the Stores and Warehouse shall collectively be referred to herein as the "Sale Location(s)").

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Agent and Merchant hereby agree as follows:

Section 1. Defined Terms.  The terms set forth below are defined in the Sections referenced of this Agreement:

| Defined Term | Section Reference |
| --- | --- |
| Advances | Section 3.2(b) |
| Agency Accounts | Section 7.2 |
| Agency Documents | Section 11.1(b) |
| Agent | Preamble |
| Agent Claim | Section 12.5 |
| Agents Fee | Section 3.7(a) |
| Agent Indemnified Parties | Section 13.1 |
| Agent Payments | Section 3.2(b) |
| Agents Share of the Profits | Section 3.1(f) |
| Augmented Merchandise | Section 15 |
| Base Payroll | Section 4.1(f) |
| Benefits Cap | Section 4.1(f) |
| Cost Factor | Section 11.1(g) |
| Cost Value | Section 5.2(a) |
| Cost Value Reimbursement | Section 3.1(f) |
| Events of Default | Section 14 |

| | |
|---|---|
| Excluded Benefits | Section 4.1(B)(i) |
| Expenses | Section 4.1 |
| Final Reconciliation | Section 3.5(a) |
| Gross Rings | Section 3.4 |
| Gross Rings Period | Section 3.4 |
| Guaranteed Amount | Section 3.1(a) |
| Guaranteed Percentage | Section 3.1(a) |
| Inventory Completion Date | Section 3.3 |
| Inventory Date | Section 3.3 |
| Inventory Report | Section 3.3 |
| Inventory Taking | Section 3.3 |
| Inventory Taking Instructions | Section 3.3 |
| Inventory Taking Service | Section 3.3 |
| Lender | Section 3.2(a) |
| Lienholder | Section 3.1(b) |
| Lien Section | Section 3.1(b) |
| Lot "A" Merchandise | Section 3.6(a) |
| Lot "B" Merchandise | Section 3.6(b) |
| Lot "C" Merchandise | Section 3.6(c) |
| Lot "A", "B" & "C" Merchandise | Section 5.2(a) |
| Merchandise | Section 5.1(a) |
| Merchant | Preamble |
| Occupancy Expenses | Section 4.1(b)(ii) |
| On Order Sold Merchandise | Section 3.6(d) |
| Pre-Existing Liens | Section 11.1(s) |
| Pre-Sale Orders | Section 8.6 |
| Proceeds | Section 7.1 |
| Profit of the Sale | Section 3.5(a) |
| Reserve Account | Section 3.5(c) |
| Retail Price | Section 3.3 |
| Retained Employee | Section 9.1 |
| Sale | Recitals |
| Sale Commencement Date | Section 6.1 |
| Sale Locations - | Recitals |
| Sales Personnel Commission | Section 3.7(b) |
| Sale Term | Section 6.1 |
| Sale Termination Date | Section 6.1 |
| Sales Taxes | Section 8.3 |
| Sold Merchandise | Section 3.6(e) |
| Stores | Recitals |
| Supplies | Section 8.4 |
| Warehouse - | Recitals |
| WARN Act | Section 9.1 |

Section 2. <u>Appointment of Agent</u>. Subject to the provisions of this Agreement, Merchant hereby irrevocably appoints Agent, and Agent hereby agrees to serve, as Merchant's

exclusive agent for the limited purpose of conducting the Sale. Agent and Merchant agree, among other things, that: (i) Merchant and Agent shall be authorized to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (ii) Agent shall be authorized to sell all Merchandise hereunder free and clear of all liens, claims or encumbrances thereon; (iii) any presently existing liens encumbering all or any portion of the Merchandise or the Proceeds shall be either released, satisfied or subordinated to the security interests and liens of Agent as hereinafter provided in this Agreement; (iv) Agent shall have the right to use the Stores and the Warehouse and all related services, furniture, fixtures, equipment and other assets of Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person; (v) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, hang interior, and with respect to non-enclosed malls, exterior, banners, and otherwise promote the Sale as a "store closing" or similar type high impact promotional sale (but in no event as a "going out of business" sale) without further consent of any person, other than Merchant, which consent shall not be unreasonably withheld; (vi) until the Sale Termination Date, Agent shall be granted a limited license and right to use the trade names, logos and customer lists relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; and (vii) Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement, and Agent shall have no successorship liabilities whatsoever;

Section 3.  Guaranteed Amount and Other Payments.

Section 3.1  Payments to Merchant.

a)  Agent guarantees that Merchant shall receive as the "Guaranteed Amount" the lesser of : (i) fifty (50%) percent (the "Guaranty Percentage"), of the aggregate Cost Value of Lot "A" Merchandise located in the Sale Locations or (ii) Two Million Dollars ($2,000,000.00) The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Lot "A" Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, and (B) the aggregate amount of Gross Rings.

b)  Notwithstanding anything to the contrary, set forth in this Agreement, it shall be a condition precedent to Agent's obligation to pay the Guaranteed Amount or otherwise perform under this Agreement that any security interest, liens, judgment or encumbrances of any nature whatsoever ("Lien") including but not limited to the security interest held by the Lender or any other lienholder, (the Lender and any other lienholder being referred to collectively as "Lienholder(s)") with respect to the Merchandise, shall be satisfied, released or subordinated to Agent's security interest, as granted in Section 16 herein and Agent shall have the right to pay all or such portion of the Guaranteed Amount to the Lienholders in order to secure such satisfaction, release or subordination. In the event that a Lien is subordinated to Agent's security interest, the Lienholder subordinating such Lien shall be required to enter into an intercreditor or standstill agreement with Agent, in form acceptable to Agent, as a condition of acceptance of such subordination.

c)  Agent shall pay to Merchant the Guaranteed Amount in the manner and at the times specified in Section 3.2(a) below.

d)    If and to the extent that Agent over-funds any amounts due hereunder, then Merchant agrees to promptly reimburse such over-payment amounts to Agent.

e)    Expenses shall be paid from the Agency Accounts at such times and in such amounts as deemed appropriate by the Agent in its sole discretion consistent with this Agreement. In the event that there are insufficient funds in the Agency Account at any time during the Sale Term, the Agent may make an Advance (as defined in Section 3.2(b) herein) to the Agency Account in its sole discretion

f)    Subject to the prior repayment in full to Agent of the Guaranteed Amount and any Advances and the payment of all Expenses, Merchant shall be paid;

i)    the "Cost Value Reimbursement" on a weekly basis as Lot "A" Merchandise is sold and as funds are available in the Agency Account, in Agent's discretion, for such purpose. As used herein, "Cost Value Reimbursement" shall mean reimbursement to Merchant of the amount representing: (a) the Cost Value of Lot "A" Merchandise" as finally determined by the parties after the Inventory Taking; less (b) the Guaranteed Amount. However, Agent may in its sole and absolute discretion withhold an amount equal to twenty-five (25%) of the anticipated Profit of the Sale (the "Agent's Share of Profit") from the Cost Value Reimbursement. Agent may also offset the Agent's Share of Profit from the Cost Value Reimbursement; and

ii)    on a weekly basis as Lot "B" Merchandise and Lot "C" Merchandise are sold, seventy-five (75%) percent of the Cost Value of Lot "B" Merchandise and fifty (50%) percent of the Cost Value of Lot "C" Merchandise. .

g)    The balance of the gross sales price received from the sale and delivery of Lot "B" Merchandise and Lot "C" Merchandise and the balance of the gross sales price received from the Sale and delivery of Lot "A" Merchandise after full payment of the Cost Value Reimbursement shall be deposited in the Agency Account

h)    Notwithstanding anything to the contrary in this Agreement, Merchant agrees that any amounts due Merchant pursuant to this Agreement may, in Agent's sole discretion be withheld until all Expenses and Agent Payments are paid or repaid, as the case may be, in full. Merchant agrees that Agent may offset against any amounts due to Merchant from any amounts due from Merchant under this Agreement

Section 3.2    <u>Time of Payments; Control Proceeds</u>

a)    <u>Payment of Guaranteed Amount</u>.    Subject to the satisfaction of the Conditions Precedent as set forth in Section 10, the Guaranteed Amount, shall be paid by Agent to the Lender, as Merchant's designee, on the first business day following the issuance of the final audited report of the Cost Value of the Lot "A" Merchandise by the Inventory Taking Service, and after verification and reconciliation thereof by Agent and Merchant (the "Final Inventory Report").    Agent shall pay North Fork Bank, in its capacity as Merchant's secured lender and designee (the "Lender"), calculated based upon the applicable Guarantee Percentage of the estimated aggregate Cost Value of the Lot "A" Merchandise to be included in the Sale, by wire transfer to such accounts(s) as are designated on Exhibit 3.2(a).

b)    <u>Repayment or Payment of Agent Payments</u>. Notwithstanding anything to the contrary set forth in this Agreement, all Agent Payments shall be paid or repaid to the Agent in full from the Agency Accounts on a first priority basis and prior to any other sums being disbursed from the Agency Accounts, subject only to the payment prior thereto of Expenses to be paid at such times and in such amounts as determined by the Agent in its sole discretion consistent with this Agreement. As used herein, "Agent Payments" shall mean: i) the repayment in full of the Guaranteed Amount; ii) the repayment of any Advances made by Agent; and iii) the payment of, or reserving of, such amounts as Agent shall reasonably perceive or anticipate shall be required to either: x) fund Agent's Share of the Profit; or y) reserve for any loss to be incurred in connection with the Sale. As also used herein, "Advance(s)" shall mean such amounts as Agent may, in its sole discretion, fund into the Agency Accounts for any purpose, including but not limited to, to pay Expenses as same may arise, it being expressly understood that nothing contained in this Agreement shall obligate Agent to make any Advance other than in its sole discretion.

Section 3.3    <u>Inventory Taking</u>.    Merchant and Agent shall cause to be taken a SKU and "Retail Price" physical inventory of the Lot "A Merchandise, Lot "B" Merchandise and Lot "C" Merchandise located in the Sale Locations (the "<u>Inventory Taking</u>"), which Inventory Taking shall be completed in all of the Sale Locations pursuant to a schedule mutually agreed upon between Merchant and Agent, but in no later than ten (10) days after the Sale Commencement Date (the "<u>Inventory Completion Date</u>"), and the date of the Inventory Taking at each Sale Location being the "<u>Inventory Date</u>" for each such Sale Location). Merchant and Agent shall jointly employ RGIS or another mutually acceptable independent inventory taking service (the "<u>Inventory Taking Service</u>") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions attached hereto as <u>Exhibit 3.3</u>, including a requirement that senior representatives of Merchant and Agent shall be personally present at the Inventory Taking at the first Sale Location as mutually agreed to by the Agent and Merchant in order to establish the standards for the Inventory Taking in the remaining Sale Locations (the "<u>Inventory Taking Instructions</u>").    Merchant and Agent shall each be responsible for fifty percent (50%) of the fees and expenses of the Inventory Taking Service. Except for the Inventory Taking costs payable to RGIS or other third party, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking. Merchant and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service. Merchant agrees that during the conduct of the Inventory Taking in each of the Sale Locations, the applicable Sale Locations shall be closed to the public and no sales or other transactions shall

be conducted.  Merchant and Agent agree to cooperate with each other to conduct the Inventory Taking commencing at a time that would minimize the number of hours that such locations would be closed for business.  As used herein, "Retail Price" shall mean the lower of: i) the lowest marked, ticketed, file, scan or PLU price utilized by Merchant during the forty-five (45) day period prior to the Sale Commencement Date; or ii) the lowest price offered to the public by Merchant by any and all means during the forty-five (45) day period prior to the Sale Commencement Date.

Section 3.4  <u>Gross Rings</u>.  For the period from the Sale Commencement Date until the Inventory Date for each Store (the "Gross Rings Period"), Agent and Merchant shall keep a strict count of register receipts and reports ("Gross Rings") to determine the actual Cost Value of the Lot "A Merchandise sold by SKU.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, based upon the Cost Value of Lot "A" Merchandise sold during the Gross Rings Period.

Section 3.5  <u>Reconciliation</u>.   On each Thursday during the Sale Term, commencing on the second Thursday after the Sale Commencement Date, Agent and Merchant shall cooperate to jointly prepare a reconciliation of the weekly Proceeds of the Sale, Expenses, including Sales Tax and any other Sale related items that either party may reasonably request.

(a)   Within thirty (30) days after the Sale Termination Date, Agent and Merchant shall jointly prepare a final reconciliation of the Sale, including, without limitation, a summary of Proceeds, Expenses, and any other accounting required hereunder (the "Final Reconciliation").  Within five (5) days of completion of the Final Reconciliation, the Agent shall determine the "Profits of the Sale".  Such Profits of the Sale shall be distributed seventy five percent (75%) to the Merchant and twenty five percent (25%) to the Agent, subject to the retention of the Reserve Account (as defined in section 3.5(c) below.  As used herein, "Profit of the Sale" shall mean the sum of i) all Proceeds remaining in the Agency Accounts after payment of all Expenses and other sums required to be paid under this Agreement; plus ii) the value of any remaining unsold Lot "A" Merchandise and Augmented Merchandise.  For the purposes of determining the Profits of the Sale, the value of Lot "A" Merchandise shall be its Cost Value and the value of any Augmented Merchandise shall be one hundred (100%) percent of its invoice cost.

(b)   During the Sale Term, and until all of the Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.

(c)   The Agent and Merchant will maintain in the Agency Account a mutually agreed upon amount of the Profits of the Sale, not to exceed one percent (1.0%) of the gross sales of the Sale (the "Reserve Account"), for the handling of chargebacks, customer complaints and accrued and unpaid Expenses.  After 100 days (or such shorter period as may be determined by Agent), the balance of the reserve in the Agency Account, if any, will be distributed seventy-five percent (75%) to Merchant and twenty-five percent (25%) to Agent.

(d)    In the event that there is a dispute with respect to the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to a court of competent jurisdiction located in the County of New York, State of New York and each party hereby agrees to submit to the jurisdiction of any such court.

Section 3.6    Classification of Merchandise.    During the Inventory Taking, Merchant and Agent shall classify all Lot "A" Merchandise, Lot "B" Merchandise and Lot "C" Merchandise located in the Sale Locations as either Lot "A" Merchandise, Lot "B" Merchandise, or Lot "C" Merchandise  As used in this Agreement:

(a)    Lot "A" Merchandise shall mean the Merchants' entire inventory of first quality matched sets of home furniture, first quality lamps and pictures, that is available for retail Sale at the Sale Locations and upon which no customer deposits have been made or taken.  Lot "A" Merchandise excludes any: i) Lot "B" Merchandise; ii) Lot "C" Merchandise; iii) Augmented Merchandise; iv) Sold Merchandise; and v) On Order Sold Merchandise.

(b)    "Lot "B" Merchandise" shall mean all inventory of Merchant which has not been designated as Lot "A" Inventory, Lot "C" Merchandise, or Augmented Merchandise. Lot "B" Merchandise shall include but not limited to; accessories, plants, mirrors, odd, unmatched, clearance, and/or used inventory of the kind and nature described on Exhibit "3.6" annexed hereto.

(c)    "Lot "C" Merchandise" shall mean all inventory of Merchant which has not been designated as Lot "A" Merchandise, Lot "B" Merchandise, or Augmented Merchandise. Lot "C" Merchandise shall include but not limited to; damaged, distressed, unsaleable and/or used inventory of the kind and nature described on Exhibit "3.6" annexed hereto.

(d)    "On Order Sold Merchandise" shall mean merchandise, which is currently "on order" by the Merchant and received by the Merchant during the Sale Term that has been designated and/or earmarked by the Merchant for the satisfaction of Pre-Sale Orders.   Upon receipt, on Order Sold Merchandise shall be segregated from Merchant's inventory.

(e)    "Sold Merchandise" shall mean merchandise, which is in Merchant's inventory on the Inventory Taking Date but which has been designated or earmarked by the Merchant for satisfaction of Pre-Sale Orders.  Sold Merchandise shall be segregated from Merchant's inventory.

Section 3.7    Payments to Agent and Sales Persons

(a)    Agent will be paid from the Agency Account on a weekly basis, a commission equal to eight percent (8%) of the delivered gross sales amount (excluding sales tax and delivery charges, delivery charges shall be as mutually agreed and contained on Exhibit 3.7) of all Merchandise sold at the Sale (the "Agent Fee").  The Agent Fee shall be an Expense.

(b)    Sales persons will be paid a weekly commission (the "Sales Personnel Commission") of five percent (5%) of the delivered gross Sales amount (excluding Sales Taxes and delivery charges (as mutually agreed and contained on Exhibit 3.7) of all Merchandise sold at the Sale.  The Sale Personnel Commission shall be an Expense.

Section 4.   Sale Expenses.

Section 4.1   Expenses are those expenses incurred in connection with and attributable to the Sale (collectively, the "Expenses"), and shall be limited to

(a)    Reimbursement to Agent of all amounts advanced by or liability incurred by Agent for the purchase of Augmented Merchandise;

(b)    The Agent Fee, and the Sale Personnel Commission;

(c)    Agent's cost of capital to be calculated at the prime rate then being charged by the Bank of America;

(d)    The costs of UCC and lien searches performed by Agent;

(e)    The expenses of the Auction, if any;

(f)    base payroll, ("Base Payroll"), of Merchant's Retained Employees used in connection with the Sale for actual days worked (or in the case of hourly employees, the hours worked); plus (b) an amount not to exceed 11.3% of such Base Payroll (the "Benefits Cap") for the payment of all related payroll taxes, workers' compensation and benefits of Merchant's Retained Employees used in connection with the Sale (including, without limitation, medical and dental benefits, group life insurance, accidental death and dismemberment insurance, short and long term disability, accrual for sick pay, and accrual for vacation and holiday pay) for all such Retained Employees used, in aggregate, which are due and attributable during the Sale Term or accrued during the period of the Sale and are attributable to the Sale, plus (c) actual costs payable to third party payroll processors;

(g)    costs of all security in the Sale Locations  including, without limitation, courier and guard service; advertising and direct mailings relating to the Sale and (b) Store interior and exterior signage and banners;

(h)    bank card fees, bank card error fees, credit card fees, and chargebacks in respect of disputed sales (however there shall be cooperation between Merchant and Agent to resolve chargeback of any kind in respect of any authorized sale on a credit card where Agent or Merchant produces a receipt evidencing that the sale subject to such chargeback was a final sale);

(i)    bank service charges (for Store and corporate accounts), check guarantee fees, and bad check expenses;

(j)    costs for additional supplies as may be required and approved by Agent;

(k)    all fees and charges required to comply with all laws and regulations applicable to the Sale;

(l)    any and all costs, including delivery and freight costs, related to the processing, transfer and consolidation of Merchandise between Sale Location (excluding all costs, including delivery and freight costs.

(m)    housekeeping and cleaning expenses related to the  Sale Locations;

(n)    all travel expenses, including living expenses, payable to Merchant's employees relating to travel by such employees at the direction of Agent, which shall include, without limitation, the costs of transferring Merchant's employees between Sale Locations; all costs and expenses of providing such additional Sale Location-level services, including, without limitation, the employment of temporary help (which shall be coordinated and implemented through Merchant's human resources department), which the Agent in its discretion considers appropriate, and other approved miscellaneous Sale Location-level expenses incurred by Agent;

(o)    postage, courier and overnight mail charges to and from or among the Sale Locations and central office (solely to the extent relating to the Sale);

(p)    actual Occupancy Expenses limited to payment on a  per Sale Location, per diem basis but limited to the per diem total, by Sale Location as described in Exhibit 4.2;

(q)    Agent's cost of insurance related to the Sale;

(r)    Any other expense reasonably approved by Agent in connection with the Sale;

(s)    The costs and expenses of providing such additional services which Agent in its sole discretion deems appropriate ;

(t)    Payment or reimbursement of any items which are to be paid from the Agency Account in accordance with this Agreement;

(u)    Merchant's cost of insurance to the extent required by Section 12 of this Agreement on a per diem basis during the Sale Term, as same is reflected on Exhibit 4.1 hereto;

(v)    The cost of after-delivery repairs to Merchandise sold at the Sales; and

(w)    Costs and expenses incurred with respect to claims arising during the Sale regarding Merchandise sold at the Sale.

(B)    As used herein, the following terms have the following respective meanings:

(i)  "Excluded Benefits" means the following benefits, except as provided in Section 4.1(f), in excess of the Benefits Cap: vacation days or vacation pay, sick days or sick leave, maternity leave or other leaves of absence, termination or severance pay, union dues or other amounts due under any union contract or collective bargaining agreement, pension benefits, ERISA coverage and similar contributions, and payroll taxes, worker's compensation and health insurance benefits.

(ii)  "Occupancy Expenses" means base rent, percentage rent, HVAC, utilities, CAM, real estate and use taxes, merchant's association dues and expenses, personal property leases (including, without limitation, point of sale equipment), cash register maintenance, telephone base fees, rental for furniture, fixtures and equipment, security systems, building alarm service, alarm service maintenance and store trash and snow removal expenses, all of the foregoing as categorized or reflected on Exhibit 4.1 annexed hereto.

"Expenses" shall not include: (i) Excluded Benefits; (ii) any rent or occupancy expenses related to the Sale Locations other than Occupancy Expenses as limited to those categories and amounts as described in Exhibit 4.1; and (iii) any other costs, expenses or liabilities payable by Merchant, all of which shall be paid by Merchant promptly when due for and during the Sale Term.

Section 4.2  Payment of Non-Sale Expenses.  Merchant shall be responsible for the payment of all expenses which are not Expenses including, but not limited to the following ("Non-Sale Expenses"):

(a)  Non-routine and/or non day-to-day maintenance or repair expenses (including repair expenses to the roof, structural portions and HVAC system at the Sale Location;

(b)  Executive compensation and employee benefits (including pension benefits, medical benefits, vehicles, vacation pay, sick days, leaves of absence, and severance pay);

(c)  Any and all expenses incurred prior to or after the Sale Term;

(d)  Rent and all related expenses under the lease related to the Sale Locations to the extent such rent and related expenses exceed the amount set forth Exhibit "4.1"; and

(e)  Any matters that are the responsibility of the Merchant or that are unrelated to the Sale.

Section 4.3  If Agent incurs a Non-Sale Expense, Agent will have the right to reimburse itself from funds due to the Merchant under this Agreement including funds due to the Merchant from the Sale of Lot "B" Merchandise, Lot "C" Merchandise, repayment of the Cost Value Reimbursement or Profits of the Sale.

Section 5.  Merchandise.

Section 5.1  <u>Merchandise Subject to this Agreement</u>.

For purposes of this Agreement, "Merchandise" shall mean:

(a)     All Lot "A" Merchandise;

(b)     All Lot "B" Merchandise;

(c)     All Lot "C" Merchandise;

(d)     All Augmented Merchandise including, but not limited to, Agent's List Merchandise; and

(e)     "Merchandise" shall not include:

i) Goods which belong to sublicenses, licensees or concessionaires of Merchandise; and

ii) Merchandise which is subject to a Pre-Sale Order whether Sold Merchandise or On Order Sold Merchandise;

Section 5.2  <u>Valuation</u>.

(a)     For purposes of this Agreement, "<u>Cost Value</u>" shall mean, with respect to each item of Lot "A" Merchandise, Lot "B" Merchandise or Lot "C" Merchandise (collectively: the "Lot "A", "B" and "C" Merchandise") the lower of either: i) the invoiced cost of such Merchandise, or ii) the cost of such Lot "A", "B" and "C" Merchandise as contained in the Merchant's books and records maintained in the ordinary course consistent with past practices; in either case, the Cost Value shall be inclusive of freight and shipping charges

(b)     Agent shall have sole and absolute discretion with respect establishment of the sale price for all Merchandise during the Sale Term, and Auction. However Agent and Merchant agree that during the Sale Term Agent will not sell Lot "A" Merchandise such that the aggregate amount received on the sale of Lot "A" Merchandise is less than 108% of the aggregate Cost Value of all Lot "A" Merchandise.

Section 5.3  <u>Excluded Goods</u>.  Merchant shall retain all responsibility for any goods not included as Merchandise hereunder.

Section 6.  <u>Sale Term</u>.

Section 6.1  <u>Term</u>.  The Sale shall commence at the Sale Locations on or about January 19, 2007 (the "<u>Sale Commencement Date</u>").  The Agent shall complete the Sale at the Sale Locations, and shall vacate all of the Store premises on or before the one hundred twentieth (120th) day after the Sale Commencement Date (the "<u>Sale Termination Date</u>"), provided, however that Agent may terminate the Sale at any Sale Locations upon fifteen day's notice to Merchant.  The period for the Sale Commencement Date to the Sale Termination Date shall be

referred to herein as the "Sale Term." The Sale Termination Date may be extended by mutual written agreement of Agent and Merchant.

Section 7.  Sale Proceeds.

Section 7.1  Proceeds.  For purposes of this Agreement, "Proceeds" shall mean the aggregate of: (a) the total amount (in U.S. Dollars) of all sales of Merchandise made under this Agreement, exclusive of Sales Taxes, and (b) any proceeds of Merchant's insurance for loss or damage to Merchandise or loss of cash arising from events occurring during the Sale Term.

(1)  Deposit of Sales.    Prior to Sale Commencement Date, Agent shall establish its own accounts, dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable hereunder (the "Agency Accounts"). Agent shall exercise sole signatory authority and control with respect to the Agency Accounts; provided however, upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts. Upon Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card proceeds) shall be deposited into the Agency Accounts.

Section 7.2  Credit Card Sales.    Agent shall establish its own Merchant identification numbers under Agent's name as agent for Merchant to enable Agent to process all credit card sales at the Sale to the Agency Account and shall under no circumstances use Merchant's existing credit card facilities. Merchant shall continue to use its credit card facilities with respect to all Sales made by Merchant prior to the Sale.

Section 8.    Conduct of the Sale.

Section 8.1  Rights of Agent.    Subject to the provisions of Section 2 hereof Agent shall be permitted to conduct the Sale as a "store closing," or similar theme sale (but in no event as a "going out of business" sale) in the Sale Locations throughout the Sale Term. Except as otherwise expressly provided in this Agreement, in addition to any other rights granted to Agent hereunder, in conducting the Sale, Agent, in the exercise of its sole discretion, shall have the right:

(a)    to establish and implement advertising and promotion programs consistent with the Sale themes set forth above

(b)    to establish Sale prices and Store hours

(c)    to use in furtherance of the Sale only without charge during the Sale Term all FF&E, advertising materials, Store-level customer lists and mailing lists, computer hardware and software, existing supplies located at the Sale Locations, intangible assets (including Merchant's name, logo and tax identification numbers), Sale Location keys, case keys, security codes, and safe and lock combinations required to gain access to and operate the Stores, and any other assets of Merchant located at the Sale Locations (whether owned, leased, or licensed);

(d)    to use without charge Merchant's central office facilities, central administrative services and personnel to process payroll, perform MIS and provide other

central office services necessary for the Sale; provided, however, that in the event that Agent expressly requests Merchant to provide services other than those normally provided to the Sale Locations and relating to the sale of merchandise by Merchant, the actual incremental cost of such services shall be an Expense; and

(e)    to transfer Merchandise between and among the Sale Locations, the costs of which shall be an Expense of the Sale; provided however Merchant and Agent shall maintain detailed listings of all transfers of Merchandise in and out of the Stores during the Sale Term and shall jointly track when and where such Merchandise is received.

Section 8.2    Terms of Sales to Customers.    All sales of Merchandise will be "final sales" and "as is", and all advertisements and sales receipts will reflect the same.    Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.    All sales will be made only for cash and nationally recognized bank credit cards or by other nationally recognized non Merchant credit facilities.    Agent will accept Merchant's gift certificates and Store credits, issued by Merchant prior to the Sale Commencement Date, provided that Agent shall be reimbursed by Merchant in connection with the Sale reconciliation contemplated under Section 3.6 hereof on a dollar for dollar basis for any gift certificates and Store credits accepted by Agent.

Section 8.3    Sales Taxes.    During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, deposited into the Agency Accounts and remitted by Agent from the Agency Accounts to Merchant on a weekly basis.    Merchant shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities. Merchant will be given access to the computation of gross receipts for verification of all such Sales Tax collections.    Sales tax shall be reconciled on a weekly basis consistent with Section 3.5.

Section 8.4 Supplies.    Agent shall have the right to use all existing supplies ("Supplies") located at the Stores at no charge to Agent.    In the event that additional supplies are required in any of the Stores during the Sale, said supplies shall be considered an Expense.

Section 8.5    Pre-Sale Returned Merchandise/Latent Defect Merchandise.

(a)    During the Sale Term, Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date, consistent with Merchant's return policy in effect at the time such item was purchased (the "Pre-Sale Returned Merchandise").    To the extent that any item of Pre-Sale Returned Merchandise is saleable as either Lot "A", Lot "B" or Lot "C" Merchandise same shall be included in Merchandise and returned to the sales floor.    Agent shall not accept returns of merchandise where the customer contemplates repurchasing the same item so as to take advantage of the sale price being offered. Agent shall reimburse customers for Pre-Sale Returned Merchandise in the same tender as such item was purchased (the "Refund").    Merchant shall promptly reimburse Agent in cash for any Refunds Agent is required to issue to customers in respect of any Pre-Sale Returned Merchandise as part of the weekly reconciliation process.    To the extent that Merchant is required to

reimburse Agent for refunds to customers in respect of any Pre-Sale Returned Merchandise, such amounts shall not reduce Proceeds under this Agreement.  Any Pre-Sale Returned Merchandise not included in Merchandise shall be, returned to Merchant at the end of the Sale Term.

Section 8.6  <u>Pre-Sale Orders</u>. Agent shall have no responsibility with respect to Pre-Sale Orders. As used herein "Pre-Sale Orders" shall mean any orders for which the Merchant has received customer deposits prior to the Commencement Date.

Section 8.7  <u>Force Majeure</u>.   If any casualty, act of God event of terrorism or governmental action prevents the conduct of business in the ordinary course at any Sale Location for a period in excess of five (5) consecutive days, such Sale Location and the Merchandise located at such Sale Location shall be eliminated from the Sale and considered to be deleted from this Agreement as of the last date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; <u>provided</u>, <u>however</u>, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced by the Cost Value of the Lot "A" Merchandise eliminated from the Sale which is not the subject of insurance proceeds or consolidated by Agent (as an Expense) into another Sale Location(s), and Merchant to the extent actually received shall reimburse Agent for the amount the Guaranteed Amount is so reduced prior to the end of the Sale Term.  As noted in the preceding sentence, Agent will use its best efforts to consolidate and transfer all Merchandise which is not the subject of insurance proceeds and include said Merchandise in the Sale in other Stores.

Section 9.   <u>Employee Matters</u>.

Section 9.1  <u>Merchant's Employees</u>.  Agent may use Merchant's employees in the conduct of the Sale to the extent Agent in its sole discretion deems expedient, and Agent may select and schedule the number and type of Merchant's employees required for the Sale.  Agent shall identify any such employees to be used in connection with the Sale (each such employee, a "<u>Retained Employee</u>") prior to the Sale Commencement Date.  Retained Employees shall at all times remain employees of Merchant, and shall not be considered or deemed to be employees of Agent.  Merchant and Agent agree that nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, payroll, benefits, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims, and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any collective bargaining or employment agreement or be deemed a joint or successor employer with respect to such employees.

Section 9.2  <u>Termination of Employees</u>.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, provided however, that Agent will consult with Merchant prior to such termination.

Section 9.3  <u>Payroll Matters</u>.  During the Sale Term, Merchant shall process and pay the base payroll and all related payroll taxes, worker's compensation and benefits for all Retained Employees in accordance with its usual and customary procedures. Such items shall be an Expense of the Sale. Agent shall provide Merchant with the names, addresses and social security numbers of all personnel which Agent refers to the Sale for Merchant's tax records.

Section 9.4  <u>Sale Personnel</u>.  Notwithstanding anything to the contrary set forth in this Agreement, personnel employed at the Sale, including hourly, salaried, and commission personnel (including warehouse and clerical personnel) whether or not referred by Agent, will be deemed to be employed by Merchant and Merchant's federal and state tax identification number will be utilized with respect to workers' compensation benefits, payment of applicable wage and withholding taxes, and the payment of salaries, wages and commissions.

Section 10.  <u>Conditions Precedent</u>.    The willingness of Agent to enter into the transactions contemplated under this Agreement and the Agent's Obligation to perform hereunder, including but not limited to, paying the Guaranteed Amount or making any Advance, are directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(a)    All representations and warranties of Merchant and Agent hereunder shall be true and correct in all material respects and no Event of Default (as defined herein) shall have occurred at and as of the date hereof and as of the Sale Commencement Date;

(b)    Merchant shall have provided Agent reasonable access to all pricing and cost files, computer hardware, software and data filed, inter-Store transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores;

(c)    Merchant shall have obtained, in its name and with the assistance of Agent, all permits and licenses necessary to conduct the Sale;

(d)    Merchant shall have obtained any necessary consent to the Sale from the Lender;

(e)    Each Merchant shall have executed and delivered a Security Agreement in the form acceptable to the Agent and to be substantially in the form to be annexed hereto as Exhibit "B";

(f)    Merchant shall have secured the satisfaction, release, or subordination of all Liens in accordance of the provisions of Section 3.1(b) to the reasonable satisfaction of Agent and, if any Lien is subordinated, the Lienholder shall have entered into an intercreditor or standstill agreement with Agent in form acceptable to Agent;

(g)    Lender and any other Lienholder which may have received any portion of the Guaranteed Amount shall have executed and delivered to Agent a document(s), in form acceptable to Agent, agreeing in substance that if Agent over funds any portion of the Guaranteed Amount, the Lender or other Lienholder shall promptly reimburse such over payment amounts to Agent;

(h)    Each of the landlords listed in Exhibit "16" annexed hereto shall have executed and delivered a landlord waiver substantially in form acceptable to Agent and to be annexed hereto as Exhibit "C" subsequent to the execution hereof with any modifications thereto acceptable to Agent; and

(i)     Agent and Merchant shall have executed an appropriate agreement recognizing and identifying Agent's List Merchandise.

Section 11.   Representations and Warranties.

Section 11.1     Merchant's Representations, Warranties Covenant, and Agreements.  Each Merchant hereby jointly and severally represents, warrants, covenants, and agrees in favor of Agent as follows:

(a)     Each Merchant: (i) is a corporation duly organized, validly existing and in good standing under the laws of its organization stated above; (ii) has all requisite power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is and during the Sale Term will continue to be duly authorized and qualified as a foreign company to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including the jurisdiction in which the Stores are located.

(b)     Each Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "Agency Documents") and to perform fully its obligations thereunder.  Each Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for such Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder, and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by each Merchant and constitutes the legal, valid and binding obligation of each Merchant enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for each Merchant's consummation of, the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore.  No contract or other agreement to which each Merchant is a party or by which each Merchant is otherwise bound will prevent or impair the consummation of the Sale and the other transactions contemplated by this Agreement.

(c)     Merchant, collectively, owns and will own at all times during the Sale Term, good and marketable title to the Lot "A" Merchandise, Lot "B" Merchandise and Lot "C" Merchandise.

(d)     Each Merchant has and will maintain its pricing files in the ordinary course of business, and prices charged to the public for goods (whether in-Store, by advertisement or otherwise) are the same in all material respects as set forth in such pricing files for the periods indicated therein.  All pricing files and records requested by Agent relative to the Lot "A" Merchandise, Lot "B" Merchandise and Lot "C" Merchandise have been and will continue to be made available to Agent.  All such pricing files and records are and shall continue to be true and accurate in all material respects as to the actual cost to each Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods as of the dates and for the periods indicated therein.

(e)    Each Merchant has maintained its Cost File in the ordinary course of business, and consistent with historic practices, including without limitation, the inclusion of freight and shipping charges and the amounts therefore.

(f)    Each Merchant has not, and shall not up to the Sale Commencement Date, marked up or raised the price of any items of Lot "A" Merchandise, or removed or altered any tickets or any indicia of clearance or reduced price merchandise.

(g)    On the date of the Inventory Taking, the Cost Value of the Lot "A" Merchandise as a percentage of the Retail Price thereof (as determined in accordance with the Inventory Taking) shall be no greater than 41.0% (the "Cost Factor"). In the event that such Cost Factor exceeds 41.0%, the Agent shall have the right to immediately terminate this Agreement.

(h)    On the date of the Inventory Taking, the aggregate Lot "A" Merchandise Cost Value will be approximately $5,800,000.00 but in no event shall the Lot "A" Merchandise Cost Value be less than $4,800,000.00, In the event that such Lot "A" Merchandise Cost Value is less than $4,800,000.00, the Agent shall have the right to immediately terminate this Agreement.

(i)    The mix and margin of the Lot "A" Merchandise included in the Sale, shall conform to the mix and margin set forth on the due diligence information provided to the Agent and annexed to this Agreement as Exhibit 11.1(i). In the event such mix and margin shall materially deviate from that set forth in section 11.1(i), the Agent shall have the right to immediately terminate this Agreement.

(j)    Each Merchant shall ticket or mark all items of inventory received at the Stores prior to and after the Sale Commencement Date in a manner consistent with similar inventory located at the Stores and in accordance with each Merchant's historic practices and policies relative to pricing and marking inventory.

(k)    Each Merchant covenants to continue to operate the Stores in the ordinary course of business from the date of this Agreement to the Sale Commencement Date, in that (i) Each Merchant shall continue selling inventory during such period at customary prices; and (ii) each Merchant shall not promote or advertise any sales or in-store promotions (including POS promotions) to the public.

(l)    To the best of each Merchant's knowledge, all Lot "A" Merchandise, Lot "B" Merchandise and Lot "C" Merchandise is in compliance with all applicable federal, state, or local product safety laws, rules and standards. Each Merchant shall provide Agent with its historic policies and practices regarding product recalls prior to the Sale Commencement Date.

(m)    Each Merchant shall throughout the Sale Term maintain in good working order, condition and repair, at its sole expense (except to the extent such amounts are included in Occupancy Expenses), all cash registers, heating systems, air conditioning systems, elevators, escalators, Store alarm systems, and all other mechanical devices used in the ordinary course of operation of the Stores.

(n)     Each Merchant has paid and will continue to pay throughout the Sale Term, (i) all self-insured or Merchant funded employee benefit programs for employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs, (ii) all casualty, liability, workers' compensation and other insurance premiums, (iii) all utilities provided to the Stores, and (iv) all applicable taxes.

(o)     Each Merchant has not and shall not throughout the Sale Term take any actions the result of which is to increase the cost of operating the Sale, including, without limitation, increasing salaries or other amounts payable to employees.

(p)     Each Merchant is not a party to any collective bargaining agreements with its employees at the Stores and, to the best of each Merchant's knowledge; no labor unions represent Merchant's employees at the Stores.

(q)     All information provided by each Merchant to Agent in the course of Agent's due diligence and preparation and negotiation of this Agreement (including information as to the Store inventories and operating expenses) is as of the date hereof and shall remain true and accurate in all material respects.

(r)     Merchant shall provide prior to the payment by Agent of any sums hereunder, including but not limited to, the Guaranteed Amount, any Advance or any delivery of the Augmented Merchandise, a list (to be annexed as Exhibit "11(r)" of all security interests or other Liens encumbering the Merchandise and Merchant shall secure the satisfaction, release or subordination of such Liens are required by this Agreement.

(s)     The Sale will not violate the terms of the respective leases for the Sale Locations and that the Merchant shall enjoy peaceful possession and occupancy of the Sale Locations during the Sale Term and that the Warehouse is properly zoned for and has a certificate of occupancy (or similar permit or license) permitting the lawful use and occupancy of the Warehouse for the storage and distribution of furniture.

(t)     Merchant makes no representation as to the profitability, if any, of any Sale or event conducted by Agent for Merchant and Merchant has not guaranteed any particular results; level of sales, revenue or profitability of the Sale.

(u)     Exhibit "16" constitutes on accurate list of the landlords for each of Merchant's Sale Locations located in the State of New Jersey.

Section 11.2 Agent's Representations and Warranties.  Agent hereby represents, warrants and covenants in favor of each Merchant as follows:

(a)     Agent: (i) is an entity validly existing and in good standing under the laws of the State of its organization; (ii) has all requisite power and authority to consummate the transactions contemplated hereby; and (iii) is and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification.

(b)    Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder. Agent has taken all necessary actions required to authorize the execution, delivery, and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents and to perform its obligations thereunder. Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms. No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair or is required for Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefore. No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

(c)    No action, arbitration, suit, notice, or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved, or to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement, or which if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

(d)    Agent make no representation as to the profitability, if any, of any sale or event conducted by Agent for Merchant and Agent does not guarantee any particular results, level of sales, revenue or profitability of the Sale.

Section 12.   Insurance.

Section 12.1   Merchant's Liability Insurance. Each Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with such Merchant's operation of the Stores, and shall cause Agent to be named an additional named insured with respect to all such policies. Prior to the Sale Commencement Date, each Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. In the event of a claim under any such policies Merchant shall be responsible for the payment of all deductibles, retention's or self-insured amounts thereunder, unless it is determined that liability arose by reason of the wrongful acts or omissions or negligence of Agent, or Agent's employees, independent contractors or agents (other than Merchant's employees).

Section 12.2   Merchant's Casualty Insurance. Each Merchant will provide throughout the Sale Term at its expenses, fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the cost value thereof. In the event of a loss to the Merchandise on or after the date of this Agreement, the proceeds of such insurance attributable to the Merchandise plus any self insurance amounts and the amount of any deductible (which amounts shall be paid by Merchant), shall constitute Proceeds hereunder and

shall be paid to Agent. Prior to the Sale Commencement Date, Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof, in form and substance reasonably satisfactory to Agent. All such policies shall require at least thirty (30) days prior notice to Agent of cancellation, non-renewal or material change. Each Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

Section 12.3  <u>Worker's Compensation Insurance</u>.  Merchant shall at all times during the Sale Term, at its cost, maintain in full force and effect worker's compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements. Prior to the Sale Commencement Date, Merchant shall deliver to Agent a certificate of its insurance broker or carrier evidencing such insurance.

Section 12.4  <u>Agent's Insurance</u>.  Agent shall maintain, as an Expense of the Sale, throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability and automobile liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Stores, and shall cause Merchant to be named an additional insured with respect to such policies. Prior to the Sale Commencement Date, Agent shall deliver to Merchant certificates evidencing such insurance policies, setting forth the duration thereof and naming Merchant as an additional insured, in form and substance reasonable satisfactory to Merchant. In the event of a claim under such policies Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, to the extent said claim arises from or relates to the alleged acts or omissions of Agent or Agent's employees, agents or independent contractors).

Section 12.5  <u>Risk of Loss</u>.  Without limiting any other provision of this Agreement, Each Merchant acknowledges that Agent is conducting the Sale on behalf of Merchant solely in the capacity of an agent, and that in such capacity (i) Agent shall not be deemed to be in possession or control of the  Sale Locations or the assets located therein or associated therewith, or of Merchant's employees located at the Stores, and (ii) except as expressly provided in this Agreement, Agent does not assume any of Merchant's obligations or liabilities with respect to any of the foregoing. Merchant and Agent agree that Merchant shall bear all responsibility for liability claims of customers, employees and other persons arising from events occurring at the Sale Locations during and after the Sale Term, except to the extent any such claim arises directly from the gross negligence of Agent, or its supervisors or employees located at the Sale Locations (an "<u>Agent Claim</u>"). In the event of any such liability claim other than an Agent Claim, Merchant shall administer such claim and shall present such claim to Merchant's liability insurance carrier in accordance with Merchant's historic policies and procedures, and shall provide a copy of the initial documentation relating to such claim to Agent. To the extent that Merchant and Agent agree that a claim constitutes an Agent Claim, Agent shall administer such claim and shall present such claim to its liability insurance carrier, and shall provide a copy of the initial documentation relating to such claim to Merchant. In the event that Merchant and Agent cannot agree whether a claim constitutes an Agent Claim, each party shall present the claim to its own liability insurance carrier, and a copy of the initial claim documentation shall be delivered to the other party.

Section 13.    Indemnification.

Section 13.1 Merchant Indemnification.    Each Merchant shall jointly and severally indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims and demands by third parties and all related penalties, losses, liabilities or damages, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against any Agent Indemnified Party, resulting from, or related to:

(a)    Any Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any failure of any Merchant to pay to its employees any wages, salaries or benefits due to such employees during the Sale Term;

(c)    any failure by any Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof;

(d)    any consumer warranty or products liability claims relating to the Merchandise;

(e)    any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act), except for Agent Claims; and

(f)    the negligence or willful misconduct of any Merchant or any of its officers, directors, employees, agents or representatives.

Section 13.2 Agent Indemnification.  Agent shall indemnify and hold Merchant and their officers, directors, employees, agents and representatives (collectively: "Merchant Indemnified Parties") harmless from and against all claims and demands by third parties, and all related penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against any Merchant Indemnified Party, resulting from, or related to:

(a)    Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document;

(b)    any harassment or any other unlawful, tortuous or otherwise actionable treatment of any employees or agents of Merchant by Agent or any of its representatives;

(c)    any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment;

(d)    any Agent Claims; and

(e)     the negligence or willful misconduct of Agent or any of its officer, directors, employees, agents or representatives.

Section 13.3 <u>Procedure for Indemnification</u>.  In the event that any claim or demand shall be asserted against a party with respect to which indemnification may be sought by such party under this Agreement, such party shall assert a claim for indemnification by written notice to the indemnifying party stating the nature and basis of such claim.  The notice shall be given within twenty (20) days of the filing or other written assertion of such claim or demand against the indemnified party.  The failure of the indemnified party to give any notice, or to give any notice within any time period, shall not relieve the indemnifying party of any liability that the indemnifying party may have to the indemnified party, except to the extent the indemnifying party has been prejudiced thereby.  The indemnifying party shall have the right to participate in, at its own expense, the defense of any claim or demand with counsel reasonably acceptable to the indemnified party.  Respective counsel for the indemnifying party and the indemnified party shall cooperate so as to avoid duplicative legal fees.   Such defense will be conducted expeditiously (but with due regard for obtaining the most favorable outcome reasonably likely under the circumstances, taking into account costs and expenditures) and respective counsel for the parties shall cooperate and advise each other promptly of all material developments.  Neither party will settle any claim or demand without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed.

Section 14.  <u>Defaults</u>.  The following shall constitute "<u>Events of Default</u>" hereunder:

(a)     Merchant's failure to perform any of their respective material obligations hereunder, which failure shall continue uncured seven (7) days after receipt of written notice thereof to the defaulting party; or

(b)     Any representation or warranty made by Merchant proves untrue in any material respect as of the date made and throughout the Sale Term; or

(c)     The Sale is terminated or materially interrupted or impaired at the Stores for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder;

(d)     Upon the occurrence of a "Material Adverse Event" which shall mean any change or occurrence that would have the effect of preventing any Merchant from performing or carrying out, in any material respect, its obligations under the Agreement or the Sale from continuing to its conclusion as contemplated in this Agreement, as determined by Agent, in its sole discretion; or

(e)     if Agent determines, in its sole discretion, to terminate the Sale upon the giving of less than fifteen (15) day notice' or

(f)     If a voluntary or involuntary petition pursuant to Title 11, Chapter 11 or Chapter 7 of the United States Code (the "Bankruptcy Code") is filed by or against one or more of the Merchants.

In the event of an Event of Default, the non-defaulting party may, in its discretion, elect to terminate this Agreement upon seven (7) business days' written notice to the other party.

Section 15.  Augmentation.  Where legally permissible, Agent shall be authorized to include in the Sale goods supplied and delivered to the Stores or Warehouse, procured on Agent's credit lines, for inclusion in the Sale ("Augmented Merchandise"), which Augmented Merchandise shall be segregated or separately identifiable from the Merchant's Lot "A", "B" and "C" Merchandise.  Procurement of Augmented Merchandise shall be in Agent's sole discretion and Agent shall be under no obligation to obtain Augmented Merchandise for the Sale.  The Augmented Merchandise on that certain list comprising approximately 42 pages ("Agent's List Merchandise"), which list shall be subject to revision as to the costs indicated and which list has been initialed by representatives of Agent and Merchant shall be deemed to be property of the Agent and in the event that any of such Agents' List Merchandise is delivered to a Sale Location for inclusion in the Sale, the cost of such Agent's List Merchandise, as reflected in Agent's books and records, shall be paid to Agent as such Agent's List Merchandise is sold, same to be deemed an Expense.  The balance of the sales price of such Agent's List Merchandise shall be deposited in the Agency Account. Said Agent's List Merchandise shall be separately tagged and identified as Agent's List Merchandise and the UCC-1 financing statements filed by Agent shall reflect same.  Agent and Merchant agree that during the Sale Term Agent will not sell Augmented Merchandise such that the aggregate amount received on the Sale of Augmented Merchandise is less than 108% of the aggregate cost value of all Augmented Merchandise.  Further, Agent and Merchant agree that at the conclusion of the Sale the Agent shall remove all Augmented Merchandise from the Sale Locations at Agent's sole cost and expense.

Section 16.  Security Interest.  In consideration of the Agent's initial payment of the Guaranteed Amount, the funding of Advances, if any, all amounts paid by, or liabilities incurred by, Agent for Augmented Merchandise, all amounts due Agent hereunder, and the provision of services hereunder to Merchant, each Merchant shall grant to Agent a valid and perfected first priority security interest in, and lien upon, all of the Merchandise and the Proceeds, including but not limited to insurance proceeds, therefrom to secure all obligations of such Merchant to Agent. Each Merchant shall execute a Security Agreement substantially in the form annexed hereto as Exhibit "B" and all such documents and take all such other actions as are reasonably required to perfect and maintain such security interest as a valid and perfected first priority security interest. Each Merchant hereby authorizes Agent to file a UCC-1 financing statement with the appropriate filing office to perfect such security interest and each Merchant shall deliver a duly executed landlord waiver substantially in the form to be annexed hereto as Exhibit "C" with any modifications thereto in form acceptable to Agent from each landlord of Merchant for Sale Locations in New Jersey as set forth on Exhibit "16".

Section 17.  Joint and Several Liability.  The obligation and liabilities of each of the Merchants hereunder shall be joint and several.  Each of the Merchants is accepting joint and several liability hereunder in consideration of the financial accommodations to the provided by Merchant under this Agreement, for the mutual benefit, directly and indirectly, of each of the Merchants and in consideration of the undertakings of each other Merchant to accept joint and several liability hereunder.

Section 18.    <u>Merchants' Obligations in the Event of Bankruptcy Filing</u>.

In the event that a voluntary or involuntary petition pursuant to Title 11, Chapters 11 or 7 of the Bankruptcy Code is filed by, or against, one or more of the Merchants, the affected Merchant(s) shall make applications to the applicable United States Bankruptcy Court for entry of an order (the "Approval Order") in form and substance satisfactory to Agent (in its sole discretion), which includes, but is not limited to, protections in favor of Agent:

a)    approving the transaction contemplated hereby pursuant to Section 363 of the Bankruptcy Code, 11 U.S.C. 101-1330 (the "Bankruptcy Code");

b)    providing Agent with the protections afforded by Section 363 of the Bankruptcy Code;

c)    authorizing the Sale without the necessity of complying with state and local rules, laws, ordinances and regulations, including, without limitation, "store closing" or similar licensing requirements, that would otherwise govern the Sale;

d)    authorizing the payments as set fourth pursuant to the terms of this Agreement;

e)    granting Merchant the right to sell all inventory in the Sale free and clear of all liens, claims or encumbrances thereon (with any presently existing liens encumbering all or any portion of the inventory or the proceeds thereof attaching only to the proceeds of the Sale after payment of the Agent's Fee and the reimbursement to Agent of the Guaranteed Amount to the extent then paid and Expenses.);

f)    authorizing the Sale notwithstanding restrictions in leases, reciprocal easement agreements, and/or contracts that purport to restrict the Sale or the necessity of obtaining any third party consents (including without limitation granting Merchant, with Agent's assistance, the right to conduct, advertise, post signs and banners and otherwise promote the Sale as a "store closing" or similar type sale, including the right to augment as more fully set forth in this Agreement);

g)    directing each and every federal, state or local agency, department or governmental authority with regulatory authority over the Sale and all newspapers and other advertising media in which the Sale is advertised to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conduction and advertising of the sale in the manner contemplated by this Agreement, an no further approval, license or permit of any government authority shall be required;

h)    providing that all utilities, landlords, creditors and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale;

G:\wpdocs\working\Clients\Ed Borowsky\Moda Furniture\ModaFurnitureAgencyAgt.v 15 (1-3-07).doc

24

i)      providing that the applicable Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement.

j)      providing that Agent shall not be liable for any claims against the Merchant other than as expressly provided for in this Agreement, and Agent shall have no successorship liabilities whatsoever;

k)      assuming this Agreement pursuant to Section 365 of the Code without any modification to the terms and conditions thereof unless specifically agreed to by Agent;

l)      confirming that to the extent applicable, waiving any stay of the Approval Order under Rule 6006(d) and 6004(g) of the Federal Rules of bankruptcy Procedure;

m)      confirming that the Agreement is binding upon any trustee appointed or elected in any Chapter 11 or Chapter 7 case; and

n)      providing that Merchant, as debtor, shall consent to any motion by Agent to effect a lifting of the automatic stay.

Section 19.   Optional Auction.

(1) At the conclusion of the Sale, Agent may in its discretion, on its own or through a third party conduct an auction (the "Auction") of any remaining Lot 'A' Merchandise, Lot "B" Merchandise, Lot "C" Merchandise or Augmented Merchandise. The Proceeds of such Auction will be deposited in the Agency Accounts. The expenses from the Auction will be paid from the Agency Account as Expenses.

Section 20.   Miscellaneous.

Section 20.1 Notices.  All notices and communications provided for pursuant to this Agreement shall be in writing, and sent by hand, by facsimile, or a recognized overnight delivery service, as follows:

|  |  |
|---|---|
| If to the Agent: | H.P.G. Enterprises Ltd.<br>One Monarch Place<br>Springfield, MA 01144<br>Fax: (413) 788-3814<br>Attn:  Mr. Edward Borowsky |
| With copies to: | Gordon Brothers Retail Partners LLC<br>40 Broad Street<br>Boston, MA  02109<br>Fax: (617) 422-6207<br>Attn:   Mr. Mitchell Cohen |

G:\wpdocs\working\Clients\Ed Borowsky\Moda Furniture\ModaFurnitureAgencyAgt.v 15 (1-3-07).doc

25

Platzer Swergold Karlin Levine
Goldberg & Jaslow LLP
1065 Avenue of the Americas
18th Floor
New York, New York 10018
Fax: (212) 593-0353
Attn:   Sydney G. Platzer, Esq.

If to any or all Merchants          Moda Furniture, Inc.
or behalf of all Merchants:         125 South Street
                                    Passaic, NJ 07055
                                    Fax (973) 249-3676
                                    Attn: Mr. Anthony Mehran

With copies to:                     Herzfeld & Rubin, P.C.
                                    40 Wall Street
                                    New York, New York 10005
                                    Fax (212) 344-3333
                                    Attn: Bernard J. Wald, Esq.

Section 20.2 <u>Governing Law</u>.  This Agreement shall be governed and construed in accordance with the laws of the State of New York without regard to conflicts of laws principles thereof.

Section 20.3 <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

Section 20.4 <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

Section 20.5 <u>No Waiver</u>.   No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party. Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

Section 20.6 <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant, and their respective successors and assigns.

Section 20.7 <u>Execution in Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one agreement.  This Agreement may be executed by facsimile, and such facsimile signature shall be treated as an original signature hereunder.

Section 20.8 <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

Section 20.9 <u>Survival</u>.    All representations, warranties, covenants and agreements made by the parties hereto shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

Section 20.10 <u>Relationship</u>.  The parties acknowledge and agree that nothing contained in this Agreement will be construed to create a relationship between them as employer/employee, joint venturers or partners.  Nothing in this Agreement will cause or deem to cause H.P.G. to assume or have any liability, directly or indirectly, for any debt or obligation of any of the Merchants.  H.P.G. will have the right to make all final decisions regarding the operation of the Sale and Auction.

Section 20.11 <u>Addition of Exhibits</u>.  The parties agree that the Exhibits to this Agreement to the extent not available at the time of execution hereof, may be attached hereto subsequent to such execution.

Section 20.12 <u>Further Documents</u>.  Merchant and Agent shall execute and deliver such other and further documents, including but not limited to exhibits and schedules as maybe reasonably necessary to consummate the transactions contemplated in this Agreement.

**IN WITNESS WHEREOF**, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

AGENT:

H.P.G. ENTERPRISES, LTD.

By: _Edward Borowsky_
Its: _president_


MERCHANT:
Moda Furniture, Inc.

By: _____
Its:


MERCHANT:
Moda Fairfield, Inc.

By: _____
Its:

Section 20.8 <u>Section Headings</u>.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

Section 20.9 <u>Survival</u>.    All representations, warranties, covenants and agreements made by the parties hereto shall be continuing, shall be considered to have been relied upon by the parties and shall survive the execution, delivery and performance of this Agreement.

Section 20.10 <u>Relationship</u>.  The parties acknowledge and agree that nothing contained in this Agreement will be construed to create a relationship between them as employer/employee, joint venturers, or partners.  Nothing in this Agreement will cause or deem to cause H.P.G. to assume or have any liability, directly or indirectly, for any debt or obligation of any of the Merchants.  H.P.G. will have the right to make all final decisions regarding the operation of the Sale and Auction.

Section 20.11 <u>Addition of Exhibits</u>.  The parties agree that the Exhibits to this Agreement to the extent not available at the time of execution hereof, may be attached hereto subsequent to such execution.

Section 20.12 <u>Further Documents</u>.  Merchant and Agent shall execute and deliver such other and further documents, including but not limited to exhibits and schedules as maybe reasonably necessary to consummate the transactions contemplated in this Agreement.

**IN WITNESS WHEREOF**, Agent and Merchant hereby execute this Agreement by their duly authorized representatives as of the day and year first written above.

AGENT:

H.P.G. ENTERPRISES, LTD.

By:_____
Its:

MERCHANT:
Moda Furniture, Inc.

By:_____
Its: _PRESIDENT_

MERCHANT:
Moda Fairfield, Inc.

By:_____
Its: _PRESIDENT_

G:\wpdocs\working\Clients\Ed Borowsky\Moda Furniture\ModaFurnitureAgencyAgt.v 15 (1-3-07).doc

27

MERCHANT:
Moda Passaic, Inc.

By: _____ PRES.
Its: PRESIDENT

MERCHANT:
Moda Middletown, Inc.

By: _____ PRES.
Its: PRESIDENT

MERCHANT:
Mode Contempo, Inc.

By: _____ PRES.
Its: PRESIDENT

EXHIBIT "A"
List of Sale Locations
And Related Information

| Store No. | Store | Address | City | State | Zip Code | Operating Merchant |
|---|---|---|---|---|---|---|
| 1 | Fairfield | 425 Route 46 West | Fairfield | NJ | 07004 | Moda Fairfield, Inc. |
| 2 | Paramus | 461 Route 17 South | Paramus | NJ | 07652 | Moda Furniture Inc. |
| 3. | Manhattan | 43 West 23rd Street | New York | NY | 10010 | Mode Contempo, Inc. |
| 4 | Middletown | 303 Route 211 East | Middletown | NY | 10940 | Moda Middletown, Inc. |
| 5 | Paterson | 1000 Market Street | Patterson | NJ | 07513 | Moda Passaic, Inc. |
| 6 | River Edge | 1001 Main Street | River Edge | NJ | 07861 | Moda Furniture, Inc. |
| 7 | Queens | 86-46 Queens Blvd. | Elmhurst | NY | 11373 | Mode Contempo, Inc. |
| | Warehouse | 125 South Street | Passaic | NJ | 07055 | Moda Passaic, Inc. |

EXHIBIT 3.2(a)

WIRE TRANSFER INSTRUCTION
TO LENDER'S ACCOUNT

EXHIBIT 3.3

INVENTORY TAKING PROCEDURES



## INVENTORY TAKING PROCESS

Moda Furniture

A physical Inventory will be conducted by RGIS starting on 1/10/07 through 1/12/07. Both HPG (The High Point Group) and Moda Furniture will be overseeing the Inventory taking process and reconciliation.

### Pre-Inventory preparation

1) Move as much merchandise as possible from the DC to the stores
2) All Merchandise must be tagged with a barcode label and current selling price
3) DC must be organized by vendor
4) Sold goods must be removed from all showrooms, properly segregated and labeled.
5) All HPG store managers (assisted by a Moda representative) must identify B lot merchandise on their floors
   a. Use a bright orange sticker dot on B Lots
   b. Use a bright green sticker dot on C lots
6) A print out of the current on hand inventory by location is required prior to the commencement of the inventory taking process
7) Each HPG store manager must construct or acquire a floor map of their location

### Inventory process

Moda Furniture will provide HPG and RGIS a validation file of the available inventory in Moda's system.
Each piece must be scanned during the inventory process. If any piece cannot be scanned, notify the HPG store manager and write the information on the hand written sheets provided. **After an item is scanned please mark the bottom right corner of the tag with a red marker.**

### Scanning requirements

In addition to the scanning RGIS must manually key in Lot Type (A,B,C), Location and the lowest Tagged Price. DO NOT SCAN SOLD MERCHANDISE.

RGIS must print out a report after each area is scanned in the store. The HPG store manager must go back through the area scanned and verify the report.

After a store location is completed the inventory team along with the HPG store manager must go back and verify that the data acquisition is accurate. Check to make sure that all items have been scanned and properly marked. The inventory team must provide an export of the data upon completion of each store location.

## Reconciliation

The reconciliation process will be conducted by HPG and Moda Furniture. The downloads from the inventory Service (RGIS) will be compared to the frozen inventory file provided by Moda. A breakdown of lot types and dollar amounts will be provided upon the completion of the inventory reconciliation. Both HPG and Moda are required to agree and sign the Inventory agreement form.



THE HIGH POINT GROUP
A GORDON BROTHERS GROUP COMPANY

## Inventory Agreement Form

### *Moda Furniture*

HPG (The High Point Group) and Moda Furniture agree that the inventory values and lot classifications listed below are correct and valid. Both parties have been fully aware and involved in the inventory taking and inventory reconciliation process.

A lot Inventory $_____

B lot Inventory $_____

BX lot Inventory $_____

Moda Furniture's Representative

_____ Date :_____ Title:_____

HPG's Representative

_____ Date :_____ Title:_____



## POST INVENTORY QUESTIONNAIRE

STORE _____   STORE MANAGER _____

DATE & TIME OF INVENTORY _____

1.   TOTAL # OF UNITS COUNTED                                                        _____

2.   TOTAL DOLLAR VALUE                                                            _____

3.   HOW MANY INVENTORY COUNTERS DID THE SERVICE PROVIDE?                _____

4.   WHAT TIME DID THE INVENTORY START?                                     _____

5.   WHAT TIME DID THE INVENTORY FINISH?                                    _____

6.   WAS THE STORE PREPPED ACCORDING TO THE INVENTORY INSTRUCTIONS?   YES/NO

7.   WAS A MAP DRAWN OF THE STORE LAYOUT TO INSURE THAT ALL SECTIONS WERE
     INVENTORIED?                                                             YES/NO

8.   ARE YOU CONFIDENT THAT AN ACCURATE INVENTORY WAS TAKEN?   IF NO, PLEASE
     EXPLAIN BELOW                                                           YES/NO


ADDITIONAL COMMENTS
_____
_____
_____
_____

**STORE MANAGER MUST COMPLETE QUESTIONNAIRE AND GIVE TO DURIEN UPON
COMPLETION OF THE PHYSICAL COUNT.**

### VERIFICIATION SIGNATURES

STORE MANAGER : _____

INVENTORY SUPERVISOR : _____

MODA  REPRESENTATIVE : _____

Schedule 3.6

## LOT "B"

Bedroom mirror without dresser

Chests and dressers from master bedroom (except entertainment armoire)

Bedroom groups and children's correlates not matching to a set (unless the coordinating bed and at least two other non-odd coordinating items are in stock)

End tables (without matching cocktail table)

Headboard without footboard (unless the headboard is a "panel" or "poster" headboard normally available for sale by the manufacturer without the matching footboard and/or rails)

Loveseat - Living Room (without a coordinating sofa)

Ottoman (unless a "pouf" designed for stand-alone sale)

## LOT "C"

Box spring without mattress

Dinette or dining room chairs without a coordinating table

Dinette or dining room table without a coordinating chair

Nightstands not matched to sets (unless the coordinating bed and at least two other coordinating items are available)

Sectional or modular prices not complete (including one-armed sofas)

Unmatched Set of Buffet Tops or Bottoms (unless a buffet bottom with a finished top surface, which is normally intended for sale by the manufacturer as a buffet)

China without glass

Dining table without leaf

Case pieces without hardware or shelves

Bases or tops without the other

Odd wedges on wall units

Damaged merchandise

EXHIBIT 3.7

AGREED DELIVERY CHARGES

Greater of:     i) $75.00; or

ii) Six percent (6%) of Sales Price of Merchandise (less Sales Taxes and any ancillary or add-on changes).

SECTION 4.1

OCCUPANCY EXPENSES
BY SALE LOCATION

4.) Expenses

MODA FURNITURE

| MODA FURNITURE | Fairfield | Paramus | River Edge | Manhattan | Queens | Middletown | Patterson | Store Total | DC Total (Passaic) |
|---|---|---|---|---|---|---|---|---|---|
| Advertising Expense: | - | - | - | - | - | - | - | - | 0 |
| Mortgage / Rent: | 1,356 | 931 | 1,181 | 604 | 1342 | 1,205 | 427 | 7,048 | 1455 |
| CAM (if applicable): | - | - | - | - | - | - | - | - | 0 |
| Property Tax: | - | - | - | - | - | - | - | - | 0 |
| Real Estate Insurance: | - | - | - | - | - | - | - | - | 0 |
| Utilities (electric / water / sewer / gas): | 254 | 138 | 504 | 36 | 148 | 55 | 16 | 1,151 | 331 |
| Telephone / Computer: | 17 | 16 | 31 | 10 | 38 | 12 | 10 | 133 | 39 |
| Music Expense (Muzak, etc, if any): | - | - | - | - | - | - | - | - | 0 |
| Trash Removal: | 18 | 8 | 17 | 4 | 3 | 12 | 22 | 85 | 92 |
| Lawn Care/Snow Removal: | 28 | 9 | 40 | - | 4 | 5 | 6 | 92 | 0 |
| Insurance (Business, Liability, Content, etc.): | 37 | 37 | 37 | 37 | 37 | 37 | 37 | 260 | 0 |
| Sales Commission (To extent not included above): | - | - | - | - | - | - | - | - | 0 |
| Group Health Insurance: | - | - | - | - | - | - | - | - | 0 |
| Employee Benefits: | - | - | - | - | - | - | - | - | 0 |
| Vehicle Expense (Lease, Insur., Lic., Repair): | - | - | - | - | - | - | - | - | 0 |
| Credit Card / Check / Finance Fees: | - | - | - | - | - | - | - | - | 0 |
| Delivery Expense (Outside Service): | - | - | - | - | - | - | - | - | 0 |
| Professional Fees (Legal / Accounting): | - | - | - | - | - | - | - | - | 0 |
| Postage / Overnight Delivery: | - | - | - | 8 | - | - | - | - | 0 |
| Property Repair / Elevator Maintenance / Etc.: | - | - | 13 | - | 8 | - | - | - | 0 |
| Equipment Rental: | - | - | - | - | - | - | - | 38 | 8 |
| Computer Maintenance / Supplies: | - | - | - | - | - | - | - | - | 0 |
| Furniture Service / Repairs: | - | - | - | - | - | - | - | - | 0 |
| Equipment Maintenance / Etc.: | - | - | - | - | - | - | - | - | 0 |
| Security / Alarm Expense: | 2 | 2 | 8 | 1 | 1 | 1 | 1 | 17 | 1 |
| Supplies (Office Sales / Whse. Cleaning): | - | - | - | - | - | - | - | - | 321 |
| Supplies (Office Sales / Other): | - | - | - | - | - | - | - | - | 87 |
| Misc. Expense / Other: | - | - | - | - | - | - | - | - | 1 |
| Supplies (Office, Sales, Whse. Cleaning): | - | - | - | - | - | - | - | - | 58 |
| TOTALS | 1,712 | 1,151 | 1,830 | 700 | 1,582 | 1,328 | 519 | 8,822 | 2,401 |

all inclusive

1

## Modi Furniture
### Gross Occupancy Expenses

| Entry No. | Location | Mortgage/Rent | Utilities | Phone | Trash Removal | Equipment Rental | R & M | Lawn Care/Snow | Security | Fire Reports | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Average Monthly Occupancy Expenses 2005-2006 | | | | | | | |
| 1 | Fairfield | 41,250 | 3,723 | 514 | 561 | 1,130 | | 833 | 65 | | 52,001 |
| 2 | Potsdam | 24,315 | 4,205 | 458 | 256 | 1,130 | 250 | 389 | 45 | | 31,064 |
| 3 | Middletown | 18,360 | 1,984 | 389 | 117 | 1,130 | 250 | 125 | 35 | | 25,293 |
| 4 | Godeler | 40,833 | 4,561 | 1,117 | 90 | 1,130 | 250 | 147 | 35 | | 48,116 |
| 5 | Middletown | 1,866 | 394 | 360 | 258 | 1,130 | | 175 | 35 | | 41,298 |
| 6 | Potsdam | 13,000 | 878 | 482 | 133 | 1,130 | | 275 | 256 | | 15,800 |
| 7 | Rock Hill | 30,911 | 15,533 | 906 | 353 | 1,130 | 400 | 1,204 | | | 55,025 |
| | Total | 214,042 | 30,461 | 4,644 | 2,571 | 7,907 | 1,430 | 2,884 | 596 | | 268,346 |
| | Per Week | 49,533 | 8,455 | 901 | 792 | 8,824 | 265 | 664 | 118 | 17 | 61,756 |

Mortgage/Rent includes CAM, Property Tax and RE Reserves

| | Location | Mortgage/Rent | Utilities | Phone | Trash Removal | Equipment Rental | Comp Maintenance | Security | Fire Reports | Supplies | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Average Monthly Occupancy Expenses 2005-2006 | | | | | | | |
| | Potsdam | 46,220 | 10,403 | 1,185 | 2,287 | 299 | 248 | 2,449 | 35 | 9,750 | 73,026 |
| | Total | 46,229 | 10,403 | 1,185 | 2,787 | 296 | 248 | 2,649 | 35 | 9,750 | 73,026 |
| | Per Week | 10,188 | 2,320 | 275 | 661 | 96 | 57 | 610 | 8 | 2,144 | 16,884 | 450 | 4,780 |

EXHIBIT 11.1(i)

DUE DILIGENCE INFORMATION
AS TO MIX AND MARGIN

**Moda Furniture**
**Inventory Mix Analysis**

*Inv. As of 11/1/06

| Department | Units | Cost | Price 1 | Price 2 | Price 1 % Total | Price 1 IMU | Price 1 Cost Factor | Price 2 % Total | Price 2 IMU | Price 2 Cost Factor |
|---|---|---|---|---|---|---|---|---|---|---|
| ACCESSORY | 4918 | 330,120 | 1,226,561 | 913,862 | 7% | 73% | 27% | 7% | 64% | 36% |
| Decor-Accessories-Plants/Floral Arr | 14 | 4,634 | 18,366 | 13,776 | 0% | 75% | 25% | 0% | 66% | 34% |
| Décor Accessories-T | 31 | 3,364 | 13,609 | 10,589 | 0% | 75% | 25% | 0% | 68% | 32% |
| Decor-Accessories-Wall | 72 | 18,280 | 67,362 | 54,961 | 0% | 73% | 27% | 0% | 67% | 33% |
| Decor-Lamps & Shades | 16 | 13,718 | 31,934 | 25,932 | 0% | 57% | 43% | 0% | 47% | 53% |
| Decor-Other/Unspecified | 813 | 87,935 | 334,271 | 251,047 | 2% | 74% | 26% | 2% | 65% | 35% |
| Furniture-Bedroom-Bedding | 1493 | 290,205 | 1,028,036 | 775,966 | 6% | 72% | 28% | 6% | 63% | 37% |
| Furniture-Bedroom-Case Goods | 7577 | 1,371,697 | 4,827,294 | 3,688,494 | 27% | 72% | 28% | 27% | 63% | 37% |
| Furniture-Dining Rm-Casual/Dinettes | 2000 | 174,772 | 617,370 | 475,996 | 3% | 72% | 28% | 4% | 63% | 37% |
| Furniture-Dining Rm-Formal | 4441 | 734,142 | 2,597,308 | 2,083,760 | 14% | 72% | 28% | 15% | 65% | 35% |
| Furniture-Entertainment | 545 | 159,938 | 512,928 | 408,272 | 3% | 69% | 31% | 3% | 61% | 39% |
| Furniture-Living Rm-Leather | 2453 | 776,327 | 2,630,665 | 2,098,053 | 15% | 70% | 30% | 16% | 63% | 37% |
| Furniture-Living Rm-Motion(w/o rec) | 10 | 2,502 | 7,230 | 5,650 | 0% | 65% | 35% | 0% | 56% | 44% |
| Furniture-Living Rm-Occasional | 3320 | 449,053 | 1,579,363 | 1,187,569 | 9% | 72% | 28% | 9% | 62% | 38% |
| Furniture-Living Rm-Recliners | 5 | 2,153 | 6,905 | 5,148 | 0% | 69% | 31% | 0% | 58% | 42% |
| Furniture-Living Rm-Uph(w/o leathr) | 1563 | 490,296 | 1,503,301 | 1,192,135 | 10% | 67% | 33% | 9% | 59% | 41% |
| Furniture-Office-Commercial | 12 | 1,274 | 4,761 | 3,436 | 0% | 73% | 27% | 0% | 63% | 37% |
| Furniture-Office-Home | 12 | 1,657 | 5,902 | 4,702 | 0% | 72% | 28% | 0% | 65% | 35% |
| FURNITURE, SPECIAL ORDER | 100 | 27,821 | 12,924 | 10,309 | 1% | -115% | 215% | 0% | -170% | 270% |
| Furniture-Other/Unspecified | 17 | 1,538 | 5,487 | 4,134 | 0% | 72% | 28% | 0% | 63% | 37% |
| Import-Bedroom-Case Goods | 268 | 54,465 | 196,209 | 133,430 | 1% | 72% | 28% | 1% | 59% | 41% |
| Import-Dining Room-Formal | 281 | 65,708 | 248,433 | 167,290 | 1% | 74% | 26% | 1% | 61% | 39% |
| Import-Entertainment | 7 | 2,410 | 7,684 | 5,508 | 0% | 69% | 31% | 0% | 56% | 44% |
| Import-Living Room-Leather | 2 | 514 | 1,888 | 1,168 | 0% | 73% | 27% | 0% | 56% | 44% |
| Import-Living Room-Occasional | 7 | 1,035 | 2,534 | 948 | 0% | 59% | 41% | 0% | -9% | 109% |
| RUGS | 14 | - | 14 | - | 0% | 100% | 0% | 0% | 0% | 0% |
| Service-Parts-Repair | 2 | - | 1 | - | 0% | 100% | 0% | 0% | 0% | 0% |
| All Other/Unspecified | 5 | 468 | 1,419 | 1,037 | 0% | 67% | 33% | 0% | 55% | 45% |
| **Grand Total** | 29,998 | 5,066,029 | 17,489,758 | 13,523,171 | 100% | 71% | 29% | 100% | 63% | 37% |

EXHIBIT 11.1(r)

PRE-EXISTING LIENS

[TO BE SUPPLIED BY MERCHANT]

EXHIBIT "16"

<u>LANDLORDS OF NEW JERSEY SALE LOCATIONS</u>

| Store No.<br>(See Exhibit "A") | Landlord Name and Address |
|---|---|
| 1 Fairfield | Contempo Realty LLC.<br>125 South St. Passaic N.J. 07055 |
| 2 Paramus | Ankar Realty Corp.<br>125 South St. Passaic N.J. 07055 |
| 3 Manhattan | Ladies Mile LLC<br>95 Forest Ave. Locust Valley N.Y. 11560 |
| 4 Middletown | 84-16Queens Blvd. Realty Corp.<br>125 South St. Passaic N.J. 07055 |
| 5 Paterson | TYMD LLC<br>125 South St. Passaic N.J. 07055 |
| 6 River Edge | Route 4 Main Street LLC<br>574 Grand Ave. Englewood N.J. 07631 |
| 7 Queens | 84-16Queens Blvd. Realty Corp.<br>125 South St. Passaic N.J. 07055 |
| Warehouse – Passaic | Contempo Realty LLC<br>125 South St. Passaic N.J. 07055 |

EXHIBIT "C"


FORM OF LANDLORD WAIVER

**EXHIBIT B**

April 18, 2007

Moda Furniture, Inc.
125 South Street
Passaic, NJ 07055
Attention: Mr. Anthony Mehran

Herzfeld & Rubin, PC
40 Wall Street
New York, NY  10005
Attention: Bernard J. Wald, Esq.

     Re:  Moda Liquidation

Ladies and Gentlemen:

Reference is made to the Agency Agreement ("Agency Agreement") dated January 8, 2007 between
H.P.G. Enterprises, Ltd. and Moda Furniture, Inc. et.al.  Capitalized terms used herein and not
defined herein shall have the respective meanings assigned to such terms in the Agency Agreement.

The parties hereby agree to supplement the agreements set forth in the Agency Agreement as
follows:

1.    Concurrently with the execution of this letter, Agent shall release to Merchant one hundred
fifty thousand dollars ($150,000) currently being held by Agent pursuant to the mutual "hold back"
established by the parties per prior reconciliation arrangements.  Merchant shall use such released
funds solely to satisfy its obligations under a settlement agreement with Collezione Europa USA,
Inc. in connection with an action filed in the United States District Court for the District of New
Jersey (Civ. Act. No. 06-cv-1104 (SRC).

2.    There shall be added a new Section 13.1(g) to the Agency Agreement which shall provide in
its entirety:
    "(g)    that certain lawsuit filed by Collezione Europa USA, Inc. against Merchant and
    certain related parties in the United States District Court for the District of New Jersey (Civ.
    Act. No. 06-cv-1104 (SRC)."
[H&K Inc.] hereby agrees to be jointly and severally responsible (with Merchant) for the indemnity
set forth solely in this new Section 13.1(g).

3.    Pursuant to Section 19 of the Agency Agreement, the parties agree that Agent will be
conducting one or more Auctions of Augmented Merchandise at the Sale Locations; and if Agent
reasonably believes that it is trending towards losing money in connection with the Sale, Agent may
include in such Auctions ~~Lot "A" Merchandise and/or~~ Lot "B" Merchandise and/or Lot "C"
Merchandise.* The parties will use best efforts to mutually agree upon the composition of any ~~Lot~~
~~"A" Merchandise and/or~~ Lot "B" Merchandise and/or Lot "C" Merchandise to be so included in the
Auctions (and if the parties do not promptly agree upon such composition, the composition shall be
as reasonably designated by Agent).

✗ (UP TO $300,000)  tm 4/20/07 🖊

4.    Except to the extent expressly and specifically set forth herein, all terms and conditions of the Agency Agreement shall remain in full force and effect.

Very truly yours,
**H.P.G. ENTERPRISES, LTD.**

By: _____
Print Name and Title:

EDWARD BORINSKY
PRESIDENT.

Agreed:
**MODA FURNITURE, INC.**

By: _____
Print Name and Title: PRESIDENT

**MODA FAIRFIELD, INC.**

By: _____
Print Name and Title: PRESIDENT

**MODA PASSAIC, INC.**

By: _____
Print Name and Title: PRESIDENT

**MODA MIDDLETOWN, INC.**

By: _____
Print Name and Title: PRESIDENT

**MODA CONTEMPO, INC.**

By: _____
Print Name and Title: PRESIDENT

Solely with respect to Section 2 above:
**[H&K, INC.]**

By: _____
Print Name and Title: PRESIDENT

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X    No. 08 civ 01867
MODE CONTEMPT, INC., MODA FURNITURE, INC.,
MODA FAIRFIELD, INC., MODE PASSAIC, INC.,
MODA MIDDLETOWN, INC.,

                                    Plaintiff,

-against-

H.P.G. ENTERPRISES, LTD

                                    Defendants.
-------------------------------------------------------------------X

## AFFIDAVIT OF SERVICE

**STATE OF NEW YORK**    )
                         )ss:.
**COUNTY OF NEW YORK**)

     **NINA MADERA**, being duly sworn, deposes and says; that deponent is not a party to the action, is over 18 years of age and resides at New York County, New York.

     That on June 12, 2008 deponent served a copy of the within **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS** upon:

                     Peter Gordon, Esq.
                     Gordon & Gordon, P.C.
                     108-18 Queens Blvd, 6th Floor
                     Forest Hill, New York 11375

the address designated by said individual or entities for that purpose by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York.

                                    _____
                                    NINA MADERA

Sworn to before me this
13th day of June, 2008

_____
NOTARY PUBLIC

          Dollie M. Kratzer
     Notary Public - State of New York
          No. 01KR6028415
        Qualified in Suffolk County
     Commission Expires August 2, 20____